

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM/LRO/JML                          *271 Cadman Plaza East*
F. #2018R00788                       *Brooklyn, New York 11201*

July 14, 2025

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Bermon Clarke
>        <u>Criminal Docket No. 20-239 (S-8) (BMC)</u>

Dear Judge Cogan:

       The government respectfully submits this letter in advance of defendant Bermon Clarke's sentencing, which is scheduled for July 21, 2025. For the reasons set forth below, the government requests a sentence of 35 years' incarceration, reflecting a substantial downward variance from the defendant's United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") advisory term of life incarceration.

I.    <u>Relevant Background</u>

    A.  <u>The Bully Gang</u>

       The Bully Gang is a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York. (<u>See</u> Pre-Sentence Investigation Report ("PSR") ¶ 10). The Bully Gang had many criminal rackets, including trafficking large volumes of narcotics to Maine; smuggling K2 into New York City jails; engaging in "scamming" and related acts of fraud; and committing violent crimes, including robberies, extortions, violence against women, shootings and murders. (PSR ¶¶ 10, 12, 14). Evidence of the gang's criminal schemes—and the defendant's involvement in them—is set forth in the PSR and in the record of the trial of four of the gang's leaders and most violent members: Moeleek Harrell, Derrick Ayers, Franklin Gillespie and Anthony Kennedy. <u>See</u> <u>United States v. Moeleek Harrell, et al.</u>, No. 20-CR-239 ("<u>Harrell</u>").[1]

---

      [1]    Citations to "Tr." refer to the transcript of the <u>Harrell</u> trial, and citations to "GX" refer to government exhibits admitted at trial.

B.  The Defendant's Offense Conduct[2]

Clarke sat atop the most lucrative of the Bully Gang's rackets: its massive, long-running, and sophisticated drug trafficking organization in Maine.  (PSR ¶¶ 16-22, 25, 27).  To manage this enormous criminal undertaking, particularly given its breadth, Clarke—along with co-defendant and fellow leader Derrick Ayers—used violence to ensure that would-be threats to the conspiracy, both insiders and others, were too scared to run afoul of the conspirators.  For instance, as described below, Clarke set a fire to a house after trapping two occupants inside—a crime that the conspirators repeatedly invoked in an effort to keep others in line.  (PSR ¶ 19).  He also engaged in sex trafficking, gun trafficking, and sadistic threats of violence to exert control over his expansive workforce.  And he was intimately involved in a broad range of the Bully Gang's criminal rackets.

1.  Clarke Oversaw the Substantial Drug Trafficking Organization

Clarke's management of the Bully Gang's lucrative drug trafficking channel between New York and Maine included substantial oversight and management of a complex web of personnel and interests.  Clarke—described and nicknamed by members of the conspiracy as an "evil genius"—oversaw multiple distinct categories of personnel: (a) Brooklyn-based drug dealers (known as "sitters"), who would travel up to Maine, where they would serve as full-time drug dealers for weeks to months at a time (PSR ¶¶ 28-29); (b) Maine-based stash house owners, who would afford the conspirators use of their residence, typically in exchange for drugs; and (c) "runners," who would transport drugs up to, or within, Maine, and would pick up cash to be delivered to the conspiracy's leaders (PSR ¶ 23).

With respect to the Brooklyn-based drug dealers, Clarke assisted in all aspects of their participation in the scheme.  Early in the scheme, Clarke booked their travel, at times sending information about Uber rides that he secured for them, and at other times ensuring that drug dealers were on buses that took them part of the way to Maine, and were met by Maine-based drug addicts whom Clarke paid with drugs to meet the dealers and drive them to the locations at which they would deal drugs.  While in Maine, the drug dealers would coordinate with Clarke and Ayers regarding how much "up" and "down"—or crack cocaine and fentanyl-laced heroin, respectively—the dealers had sold, and how much they had left, on a daily basis.  Clarke and Ayers micromanaged these "numbers"—requiring sitters to report their "counts" on a daily basis—in order to ensure that workers were not stealing drugs or money.  Clarke would arrange for other members of the conspiracy to provide regular "re-ups" and collect money from the stash houses. Dozens or hundreds of drug dealers worked for Clarke as part of this conspiracy.

Clarke also actively managed the enormous roster of drug addicts who assisted the conspiracy in Maine.  Clarke would identify addicts—frequently sex workers—who were able to provide premises throughout the state for the conspiracy to use as local franchises.  Again, dozens of drug addicts in Maine worked for the conspiracy over the years that the defendant oversaw its

_____

[2]    The facts described herein are drawn from witness interviews, law enforcement reports, and electronic communications, including communications from the defendant's devices. The government is prepared to prove any of the facts alleged herein at an evidentiary hearing.

operations. Clarke spent substantial amounts of time in Maine during the conspiracy, as verified at trial. (See GX7013 at 6-7 (showing the movement of the defendant's phone to, and throughout, Maine); GX2520-B (showing the defendant on the pole camera outside of the conspiracy's Portland headquarters)).

The defendant also recruited other members into the conspiracy, including women whom he seduced, and eventually, introduced into a life of violent crime. Among others, the defendant recruited Amy Sonnenblick, who worked with him as a paraprofessional for the New York City Department of Education, to serve as a money launderer and drug runner for the conspiracy. Sonnenblick, who also housed the defendant for a period of the conspiracy (PSR ¶ 136), was one of at least three co-conspirators with overlapping sexual relationships with the defendant (PSR ¶ 56). At the defendant's request, Sonnenblick smuggled drugs and deposited drug-trafficking proceeds for the benefit of the conspiracy; she is depicted below depositing substantial cash proceeds from the defendant's drug trafficking:



Sonnenblick's employment with the Department of Education also provided her with the cover to make purchases on behalf of the conspiracy that would have been flagged had they been made by the conspirators themselves. Notably, Sonnenblick purchased Ayers a Range Rover after other members of the conspiracy tried and failed. (PSR ¶ 25).

Although Clarke had a legitimate day job, the Maine conspiracy was lucrative for him and his partners in crime. Photographs from the large apartment in Rahway, New Jersey, that

the defendant was able to afford, taken on the day of the takedown of the case in June 2020, show multiple casually stacked piles of substantial amounts of money, as well as an electronic money counter:





Clarke's Rahway home also had numerous cell phones used by the conspirators, and other tools of the Bully Gang's trade:





Notably, the high-powered Fabrique Nationale Herstal (or "FN") firearm and the blue-tipped ammunition depicted in GX112-AY and GX112-BD above are consistent with the distinct weapon and ammunition used by Ayers to kill Jonathan Jackson. (See, e.g., Tr.2671).

When he was ultimately arrested on June 25, 2020, Clarke was driving the Volvo that he used as a tool of the conspiracy. Law enforcement agents who searched the Volvo

uncovered a hidden trap compartment containing over $135,000 in cash and a firearm with
ammunition. (See generally Tr.4219-22):









Because they were dependent on drug addicts, the conspiracy's leaders, including Clarke, depended on the addicts' fear and addiction to keep them in line. In one instance that exemplifies his "evil genius" persona, Clarke sought to punish a drug runner who "messed up" by mimicking the creation of a murder scene, frightening the runner into believing that she would imminently be killed. (Tr.1472). Clarke summoned the runner to a house in Maine where he "had put down a bunch of trash bags or clear bags on the floor and around her and put her in a chair," and began "threatening her with a gun." (Tr.1478). In later bragging about his exploits to co-conspirators, Clarke explained that he put the trash bags down "[t]o scare [the runner]" (id.), and the runner later admitted to co-conspirators that, in fact, "she was terrified" (Tr.1479). In addition to this instance, Clarke repeatedly and explicitly threatened violence against his subordinates and their family members. (PSR ¶ 55).

> 2.    Clarke Persistently Used Sex Trafficking as a Tool of the Organization

Clarke cruelly withheld drugs from subordinate drug addicts unless they agreed to have sex with him whenever, wherever, and however he wanted. (PSR ¶ 56). At least two subordinates in the drug conspiracy (identified herein as "CC-1" and "CC-2") were drug addicts whose sexual favors Clarke obtained by selectively providing and withholding drugs. (Id.). CC-1 was identified by Clarke from advertisements on a website used by sex workers—one which Clarke frequented regularly and routinely used to recruit workers in Maine. CC-2, by contrast, had not otherwise engaged in commercial sex work but was enlisted by Clarke to perform sex acts in furtherance of the drug-trafficking conspiracy. Clarke ensured that both CC-1 and CC-2 engaged in sexual activities on behalf of the drug trafficking organization he ran, both for his own gratification and for the gratification of others working on behalf of the organization. On at least one occasion, Clarke forced CC-2 to participate in a threesome with Clarke and CC-1.

At times, one or more female members of the conspiracy would rack up substantial debts to the conspiracy, in part because they would use drugs that were provided to them to sell. When they did, the defendant would extort them, pretending to be their protector, and would demand sexual gratification in exchange for not permitting his co-conspirators—notably Ayers—to punish the debtors more violently. (PSR ¶ 58). Although Clarke would permit these co-conspirators to remain involved in the conspiracy, he did not discharge their debt, and it remained a cudgel he could invoke to take what he wanted from them.

Clarke also coerced his female co-conspirators to engage in sex acts as part of his management of the drug trafficking organization. Although Clarke was engaged in a sexual relationship with CC-1 and others, and although he engaged in sexual activities with CC-2 when he saw her, he directed both CC-1 and CC-2 to engage in sex acts with other members of the conspiracy, and he directed at least one female subordinate to have sex with a co-conspirator against her will. (PSR ¶ 59). CC-1 and CC-2 understood that Clarke would withhold drugs from them if they refused to comply with his demands, and both relied on Clarke to feed overpowering addictions and avoid crippling withdrawal symptoms. (PSR ¶ 57). Clarke used sexual relations with female co-conspirators as a "perk" for drug dealers within the conspiracy, and he not only directed female co-conspirators to engage in sexual acts at his direction, but he also threatened them when they engaged in consensual sex with others, because it diluted the value of what he could otherwise provide—sexual relationships with addicts whose participation he coerced. (PSR ¶¶ 59-61).

3.    Clarke Burned Down a House After Locking Two People Inside

Clarke's organization ran a stash house in Blaine, Maine, in 2017.  (PSR ¶ 51).  The house was owned by a non-resident drug addict (the "Owner") and was occupied by two resident drug addicts who did not work for the conspiracy ("Victim-1" and "Victim-2").  Co-defendant Amanda Huard, Huard's friend (the "Friend"), and a drug dealer working for Clarke (the "Sitter") were staying in the house, when there was a robbery attempt on it.  The residents fortified the front door.

After the first robbery attempt at the house, there was a successful robbery on August 21, 2017.  Masked armed robbers broke into the house the morning that morning, and robbed the downstairs residents (Huard, the Friend, and the Sitter)—pistol-whipping the Friend, and taking phones from the Friend and the Sitter.  (PSR ¶ 51).  Because the robbers were able to undo the precautions taken by the residents, and because they recognized his voice, Huard and the Friend identified the Owner as one of the robbers.  (Id.).

Huard, the Sitter, and the Friend traveled to co-defendant Nicolette Tompkins's house and called Clarke.  (PSR ¶ 52).  Approximately four hours later, Clarke arrived; although he initially went out looking to confront the Owner directly, he returned to Tompkins's house with a can of gasoline.  (Id.).  Clarke, Huard, Tompkins, the Friend, and the Sitter returned to the stash house where the robbery took place.  (PSR ¶ 53).  Clarke ordered Huard and the Friend to retrieve their personal effects (the Sitter had already taken his).  (Id.).  Tompkins also went inside the house to retrieve furniture.  (Id.).

Victim-1 and Victim-2 were still present at the house, and Victim-1's car was still in the driveway.  (Id.).  Clarke went inside the house to interrogate them about the robbery.  (Id.).  Clarke then demanded that they return to their upstairs bedroom and pushed a dresser in front of the closed door to the bedroom—blocking their escape.  (Id.).  Clarke then poured the gasoline across the house and on Victim-1's car.  (Id.).  Clarke lit the house on fire with a cigarette, and once there was a major explosion, the co-conspirators left the scene.  (Id.).  The house was destroyed, as depicted below:





Victim-1 and Victim-2 were initially unable to leave their bedroom because Clarke had deliberately blocked them in, but they were able to narrowly escape through a window. (PSR ¶ 54). Victim-1 and Victim-2, who occasionally cooked methamphetamine (not for Clarke's conspiracy) in the Owner's house, were initially blamed by law enforcement for the traumatic fire that destroyed their home and nearly killed them. (Id.).

4.    Clarke Repeatedly Secured Guns for the Bully Gang

Clarke also repeatedly helped the violent Bully Gang to secure weapons, by relying on his cadre of Maine residents to make unlawful straw purchases on behalf of undisclosed recipients of the firearms. First, in August 2017, Clarke enlisted Tompkins and Huard to obtain a "boom," or gun, for him. (PSR ¶ 63). Before purchasing the gun for Clarke, Tompkins asked for an image of the gun, reproduced below:



Ultimately, Tompkins purchased this gun, a Ruger firearm, for Clarke and advised him of it through Huard. (Id.). Tompkins provided Clarke the gun in exchange for drugs. (Id.). That firearm was later used in a shooting in Manhattan. (Id.).

In August 2019, Clarke remotely arranged for co-defendant Keon Grant, a Bully Gang member, to instruct co-defendants Joanne Lydem and Nadine Heath (both Maine-based drug addicts who worked for Clarke), to purchase a firearm. (PSR ¶ 64). Clarke also messaged Grant to advise him how much drugs to pay each of the addicts in exchange for their cooperation. (Id.). After the purchase, Clarke ensured that he knew the amount of money used to purchase the gun. Clarke asked Grant how much money he had provided to Lydem and Heath, how much money they brought back, and how much the gun cost. Clarke also demanded proof of the purchase, asking Grant to send him a photograph of the gun's box, which Grant did.

Law enforcement authorities ultimately found the same gun in the hidden compartment of the car Clarke was driving, alone, when he was arrested in June 2020. (Id.). (Photographs from the search of Clarke's car depicting this gun are reproduced above.)

11

Two months after Clarke used Grant, Lydem and Heath to buy this gun, Clarke arranged for two addicts—Heath and co-defendant Janet Blood—to obtain two more guns for the conspiracy. (PSR ¶ 65). On the day of the purchase, Clarke sent Heath text messages with the phone number of the gun store and listing his preferred types of guns, including a "Springfield XD® 3″ SUB-COMPACT .40SW" and a "G27." Heath then messaged Clarke saying that she and Blood were "checking out" with a "Glock" and a "Springfield." Records from the gun store confirm that Heath purchased a Springfield XD9 9mm and Blood purchased a Glock 27 pistol. Heath then sent Clarke a message to complain about the small amount of drugs she was given in exchange for the purchase and Clarke responded "U weren't pose to get anything because u did it to clear ur debt but I blessed u kuz I like u." This text message is consistent with Clarke's use of clearing drug debt as a means to force drug addicts to do his bidding, which is described in more detail below.

The day after Heath and Lydem purchased these guns for Clarke, Clarke messaged the phone at Heath's stash house and asked for photographs of the guns. A person using that phone responded with the below photographs:




The gun Heath purchased was recovered in co-defendant Nia Govan's apartment in Boston during the June 2020 takedown in this case. Govan testified at trial that this gun belonged to co-defendant Derrick Ayers. (Tr.823-24).

On June 24, 2020, the day before he was arrested, Clarke traveled to his stash house in Swanville, Maine, in order to purchase another gun—a Glock—in exchange for drugs. (See GX2520-A; GX1151-D; see also Tr.1480-83 (detailing two instances during which Clarke made unlawful gun purchases in Maine)). Clarke inspected the gun, decided to purchase it, and instructed the sitter in the house to "hold it until [the co-conspirators] could get it." (Tr.1482).

5.    Clarke Was Involved in Crimes with Senior Bully Gang Leaders

Clarke committed his crimes with senior members of the Bully Gang, and those senior gang leaders trusted Clarke in connection with their most serious and violent crimes. This trust substantially predated "the end of the 2018 school year" (Def. Ltr. at 9). The communications that senior gang leaders had with Clarke—about murder conspiracies, about actual murders, and about the gang's rackets—predated his claimed introduction to the gang's work, and were not consistent with communications that security-minded gang leaders would have with a mere interloper.

For example, in October 2017, after Ayers's car was used in an attempted murder of Christopher Stukes (a Bully Gang rival), Ayers texted Clarke a video of his car on the news linked to the shooting, writing "It's over for my car." (GX1128 at 135).[3] Ayers had no hesitation entrusting Clarke with the news that Ayers's car was involved in the gang's attempted murder, and advising Clarke that the vehicle—an important tool of their drug trade—would be out of commission.

Also in October 2017, Clarke spoke with the gang's leader, co-defendant Moeleek Harrell, advising him "It's a no go the bitch fumbled last night…I gotta go up there." (GX1128-F at 2). Harrell asked Clarke for the buses that they could use to travel to Maine. Clarke also sent Harrell screenshots of a social media page from user "Bighomie Bigopp" mocking the Bully Gang, including posts "If you from Fulton and [r]ep Bully gang Suck my Dick," "Bully gang my dick you bully gang suck my dick," "KILLA GOT THESE N****S UNDER PRESSURE DONT WORRY IF HE GO TO JAIL I GOT THE BAIL," and "You got shot in the head and you ain't do shit." (Id. at 8, 11-12). Clarke was apprised of the gang's rivalries, and in these and other messages, sent intelligence about these rivalries to the gang's leader, while simultaneously communicating with the leader about the racket Clarke ran for the gang. Clarke also communicated with Harrell about the Maine conspiracy in 2018, sending him addresses of the gang's stash houses. (GX1110-BJ).

Members of the gang included Clarke in gang business. For instance, during one notable jail call, Harrell and incarcerated Bully Gang member Joell Joyce discussed co-defendant Tyquawn Lane ("Ty-Ty"), who was being punished by the gang for violating its rules. (GX2060 and GX2060-T). Harrell explained to Joyce that he felt conflicted about allowing the gang to punish its own, but recognizing that it was necessary. Members of the gang caught Lane and beat him, although during the beating Lane "sp[u]n and knock[ed] Berm out." (GX2060-T at 4). The reference to "Berm" in this call shows that Clarke was part of the group of gang members who assaulted Lane for violating the gang's rules. After Ayers, Clarke, and the other gang members

---

[3]    The same exhibit includes communications from August 2017 in which Ayers asked Clarke "What's going on up top," a reference to Maine, and Clarke responded that the person asking for "the numbers" already knew the numbers, and that Clarke was "waiting on a [co-defendant Amanda Walton]." (GX1128 at 26, 29). This text message exchange further demonstrates that Clarke was involved in the conspiracy well before the end of the 2018 school year.

finished assaulting Lane, as another gang member told Harrell, Lane's "jaw gotta be broke," because "[h]is face od on one side." (GX1108-BP).

Clarke also assisted co-defendant and Bully Gang member Avery Goodluck in running the gang's "scamming" activity up and down the east coast. Clarke was personally responsible for creating fraudulent credit cards. As Walton described, Clarke used "machines" that would stamp "the picture on the front," stamp "the number on it with [a false] name," and "run the magnetic strip with the credit card information on it." (Tr.1252). Clarke also exchanged messages with Goodluck about their scamming activity, including sharing photographs of fake cards they were creating:

  

Thereafter, Goodluck and others, including addicts who were purportedly "in debt" to the co-conspirators, took out-of-state scamming "trips" to make expensive purchases, including electronics (like Macbooks or iPhones), cigarettes, alcohol, and gift cards. (Tr.1254; 1819-20).

Clarke was also present when numerous Bully Gang members, including Ayers, Goodluck, and others confronted another person ("Victim-3") in a Brooklyn stairwell in relation to a drug debt. (PSR ¶ 62; GX1128-E.1). As shown in video capturing this incident, Clarke confronted Victim-3, asking him, "Why is you asking me for twenty dollars when you doing this side shit that I told you not to do?" (Id.). Clarke told Victim-3, "I gave you an opportunity," and advised Victim-3 that Victim-3's "side shit" was "not how you clear your debt." (Id.). Clarke advised Victim-3, "Look. This is the same way I been talking to you. I don't act tough 'cause n****s here. I just want my change, Bro…I gave you an opportunity." Ayers then repeatedly punched Victim-3, who fell to the ground. Then Clarke said, "I still want my change, though…You had to give my change. You just fucked it up." (Id.). The video of this incident further showed that Ayers was armed with a gun during this extortion.

Indeed, the gang's trust of Clarke extended to their most closely guarded secrets. Clarke supplied the burner phones to members of the gang, including those Gillespie and Kennedy used in connection with the murders of Paul Hoilett and Mike Hawley. (GX7010 at 17 and 8; GX1601). On the night of Hoilett's murder, Kennedy called Clarke via FaceTime twice at 11:57

14

p.m.—they spoke—and then Clarke called again at 1:10 a.m., and again they spoke.  (GX7014). Kennedy declined a call from Clarke at 1:36 a.m. and called him back twice at 1:44 a.m., when they connected for a two-minute video Facetime call.  (Id.).  They connected again at 1:58 a.m. and 2:11 a.m.  (Id.).  These six contacts with a security-conscious gang member who had just committed a murder belie any claim that Clarke was an outsider.  Communications between the murderers and Clarke continued over the next few days.  (Id.).  Four days later, the day Hawley was murdered, Gillespie and Kennedy met up with Ayers and Clarke in Rahway, New Jersey before the murder.  (GX7011 at 137).

Clarke also wore chains associated with the Bully Gang, which the gang would not have permitted had he not been closely affiliated with the gang:[4]



### 6.    Clarke Has Demonstrated an Ongoing Commitment to the Gang

Multiple witnesses have reported in the  years since the arrests in this case that Bully Gang members have threatened them or put a bounty on them or on others to try to prevent them from talking to law enforcement or providing evidence or testimony in connection with the gang's crimes. These witnesses have identified Clarke as among the Bully Gang members involved

---

[4]    One witness would testify that Clarke claimed to be scornful of the gaudy Bully Gang chain and wore it ironically.

in this threatening behavior.  Other witnesses have reported that Clarke, among other Bully Gang members, contacted them to discuss the case.  Records from Meta Inc. further reflect that Clarke used his Instagram account while detained at the Metropolitan Detention Center ("MDC") and communicated with co-defendants, including Ayers, through that platform.  In the "About Me" section of his Instagram account, Clarke identified himself as "The Black Danny Ocean!!"  In addition to Ayers, Clarke communicated with users with names such as "strizzybg" and "CostaNostra."  Clarke also communicated with James Sease, also known as "Chop Whop," a senior leader of a set of 5-9 Brims who pled guilty in 2022 to racketeering conspiracy, including murder conspiracy, among other crimes.  See United States v. Bush et al., No. 19-CR-378 (PKC).

In April 2025, MDC officials found both a cell phone and a weapon in Clarke's cell.  (PSR ¶ 70).  The contraband phone that Clarke possessed was logged into the same Instagram account:



Although review of the phone is ongoing, it reflects that Clarke is still in communication with both Sease and Marvin Pippins, also known as "Mukk," another member of the same set of 5-9 Brims convicted at trial of murder in-aid-of-racketeering, racketeering conspiracy, and other crimes.  Clarke was also in communication with "Meexhii.all," a likely reference to co-defendant Demettrius ("Meexhi") Wright, a member of the 5-9 Brims gang who dealt drugs for the defendant.

II.    United States Sentencing Guidelines

As set forth in the PSR, and not disputed by the defendant, the defendant faces a Guidelines range of life in prison.  This Guidelines range is based on an offense level of 43 and a criminal history category of I.

Clarke pled guilty to racketeering and arson.  In connection with his racketeering plea, Clarke admitted that his racketeering acts included participating in a drug trafficking conspiracy and arson.  As noted in the PSR, the government has identified two additional racketeering acts that constitute related conduct for purposes of Clarke's sentencing Guidelines: money laundering and extortion.  Clarke also stipulated in his plea agreement that, on three separate instances, he committed the crime of firearms trafficking and that these three instances of

firearms trafficking would be included in his Guidelines calculation pursuant to U.S.S.G. § 1B1.2(c).

As the PSR explains, Clarke's crimes comprise three groups for purposes of the Guidelines. The first group consists of drug trafficking, money laundering, and gun trafficking. The second group consists of the two convictions relating to the arson. And the third group consists of the extortion. Below is the Guidelines calculation for each group:

<u>Group 1: Drug trafficking, money laundering, gun trafficking</u>

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2D1.1(a)(5), 2D1.1(c)(1)) | | 38 |
| Plus: | Dangerous weapon possessed (U.S.S.G. § 2D1.1(b)(1)) | +2 |
| Plus: | Use of violence (U.S.S.G. § 2D1.1(b)(2)) | +2 |
| Plus: | Maintained a premises for manufacturing or distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)) | +2 |
| Plus: | Use of fear, impulse, friendship and/or affection (U.S.S.G. § 2D1.1(b)(16)(A), (E)) | +2 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |
| Total: | | <u>50</u> |

<u>Group 2: Arson</u>

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2K1.4(a)(1)) | | 24 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | | <u>30</u> |

<u>Group 3: Extortion</u>

| | | |
|---|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2B3.2) | | 18 |
| Plus: | Threat of Death, Bodily Injury, or Kidnapping (§ 2B3.2(b)(1)) | +2 |
| Plus: | Firearm Brandished (§ 2B3.2(b)(3)(A)(iii)) | +5 |
| Plus: | Victim Sustained Bodily Injury (§ 2B3.2(b)(4)(A)) | +2 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |

| | | |
|---|---|---|
| Total: | | <u>31</u> |
| <u>Grouping analysis:</u> | | |
| Group 1 | | 50 |
| Group 2 | | 30 |
| Group 3 | | 31 |
| Levels Added | | +0 |
| <u>Total</u>: | | <u>50</u> |
| Less:  Acceptance of Responsibility (§ 3E1.1) | | <u>-3</u>[5] |
| <u>Adjusted total:</u> | | <u>47</u> |

Pursuant to U.S.S.G. § 5A, note 2, an offense level of more than 43 should be treated as if it were an offense level of 43.  Therefore, the defendant's total offense level is reduced to 43.

The above offense level calculation differs from the calculation in the PSR in two respects.  First, in the drug trafficking count, the PSR includes the Rikers Island drug trafficking scheme, and the above calculation does not.  The government does not intend to prove by a preponderance of the evidence that Clarke was involved in the Rikers drug trafficking.  The government has therefore not included the Guidelines enhancement for supplying drugs inside of a correctional facility.  The government has also removed the synthetic cannabinoids from the defendant's drug weight calculation, but this did not change the base offense level for the Guidelines calculated by Probation.  Second, the government has added a leadership enhancement to the Guidelines calculation for group 3, the extortion.  As the PSR notes in paragraph 80, a leadership enhancement should be applied to each racketeering act.  Neither of these two changes affects the ultimate sentencing range of life in prison.

---

[5]     Whether acceptance-of-responsibility credit applies does not affect the Guidelines range in this case, so the government includes it here.  The defendant timely notified the government of his intention to plead guilty.  Nevertheless, it is not appropriate to credit, for Section 3553(a) purposes, that the defendant has genuinely owned responsibility for his criminal conduct.  He has done the bare minimum to plead guilty, and he appears to be arguing, among other things, that he is merely responsible under co-conspirator liability for crimes that he committed with his own hands—including the arson described above.  (<u>See generally</u> Def. PSR Objections).

III.    The Appropriate Sentence

   A.    Applicable Law

         In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that
the Guidelines are advisory and not mandatory.  The Court made clear that district courts are still
"require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor
the sentence in light of other statutory concerns.  Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a).
After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to
the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)."  United
States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine
what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable
sentence, the Court cautioned that judges should not "return to the sentencing regime that existed
before 1987 and exercise unfettered discretion to select any sentence within the applicable
statutory maximum and minimum."  Id. at 113.

         The Supreme Court elucidated the proper procedure and order of consideration for
sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by
correctly calculating the applicable Guidelines range.  As a matter of administration and to secure
nationwide consistency, the Guidelines should be the starting point and the initial benchmark."
Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should
"consider all of the § 3553(a) factors to determine whether they support the sentence requested by
a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is
reasonable.  [The sentencing court] must make an individualized assessment based on the facts
presented."  Id. at 49–50 (citation and footnote omitted).

         Section 3553(a) requires a court to consider a number of factors in imposing
sentence, including the nature and circumstances of the offense and the history and characteristics
of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote
respect for the law, and to provide a just punishment for the violation; and the need for the sentence
to afford adequate deterrence to criminal conduct; to protect the public from further crimes or
violation of the defendant; and to provide the defendant with needed education or vocational
training, medical care or other correctional treatment in the most effective manner.  The court must
also consider the kinds of sentences available, the applicable sentencing guideline and pertinent
policy statements, and the need to avoid unwarranted sentencing disparities.  See 18 U.S.C.
§ 3553(a)(1)-(6).

   B.    Application to This Defendant

         The government respectfully submits that a sentence of incarceration of 35 years'
imprisonment would be sufficient but not greater than necessary to achieve the goals of sentencing.
Although it constitutes a substantial downward variance from the defendant's Guidelines range of
life imprisonment, it is a considerable sentence, which is required in light of the serious nature of
the defendant's crimes, including both the statutory offenses but more specifically the heinous
ways in which he committed them.  Far from the bookish drug dealer described in the defendant's
letter, Clarke was the ruthless mastermind behind a violent organization that employed torture,
physical assault, sexual assault, arson, and threats to accomplish their cruel and selfish ends.  A

sentence less than 35 years' imprisonment would not provide just punishment for the crimes the defendant committed and, particularly, for the ways in which he committed them.

The defendant's submission misrepresents the timeline of his descent into criminality; Clarke was firmly ensconced in the criminal conspiracy long before the "end of the summer [of 2019]" (Def. Ltr. at 9), and indeed was involved from at least 2017.  The government does not dispute the defendant's description of his childhood in St. Lucia and the difficulties he experienced growing up in Crown Heights, but the length to which he was willing to go to escape poverty—and the degree to which he was willing to subject others to inhuman conditions and abuse to marginally increase his wealth thereafter—stands out among similarly situated defendants in this district.  Notably, the defendant's claim that he participated in the Maine drug trafficking conspiracy out of a desperation for money is belied by that the defendant had a legitimate source of income during the time of the conspiracy.  In addition, the defendant possessed at least a hundred thousand dollars in proceeds from the conspiracy, well in excess of what he would need if his goal was merely financial stability.  The defendant's rabbit anecdote might provide an origin story for the "evil genius" behind a lucrative and vicious drug organization, but the defendant's conduct over years makes clear that he is the villain of the story.[6]

The nature and circumstances of the defendant's offenses are horrific.  The massive drug-trafficking conspiracy that the defendant ran profited at the expense of entire communities, and many families suffered tragedies far worse than the loss of a pet because caregivers were addicted to the poison that the defendant brought into rural communities in Maine out of greed and avarice.  The sheer volume of drugs that the defendant sold is almost incomprehensible outside of a cartel case.  The defendant's conspiracy blanketed the state of Maine with cheap and powerful heroin, laced with fentanyl, that drug addicts described as far superior to any rival's product in the area, and they built a steady customer base of people who might otherwise have been loving family members and productive members of society, but who instead became addicted to drugs and were induced to participate in criminal activities in order to support their habits—such as the drug-addict robbers who robbed Huard and the Friend—or to remain in the defendant's good graces, such as Heath, Blood, Tompkins, Huard, and  Lydem, who all helped to arm the Bully Gang at the defendant's request.

The defendant traded coerced sexual favors by subordinate drug addicts, induced by threats of withholding drugs, as a means of ensuring order and discipline within his ranks.  (PSR ¶¶ 60-61).  Although uncharged, the fact that he engaged in criminal sex trafficking as a means of furthering his drug trafficking organization underscores the extent to which the Guidelines, which reflect only the fact of the drug dealing, actually understate the severity of the defendant's crimes.  (This is distinct from the defendant's personal use of drug addicts for sexual gratification, seemingly at his will, with consent obtained only through threats—a separate basis for an upward departure, see PSR ¶ 81).

---

[6]        The defendant's letters in support of his memorandum include a letter from an unindicted co-conspirator and a separate lengthy letter from a person who states he knew the defendant for nine years and yet repeatedly refers to the defendant as "Belmon." (Def. Ltr. Ex. B).

Similarly, the defendant's arson was a particularly egregious iteration of that crime. Setting a house on fire is never a peaceful event, but the defendant's decision to barricade the doors so that two drug addicts would be trapped in an upstairs bedroom as their residence burned to ashes around them made an explosive crime potentially homicidal.  Far from an act of anger, the defendant's arson was a calculated effort to send a message to enemies of his criminal organization: mess with us, and you will lose your home and everything that you own—or worse, you will burn alive.  The defendant sent a similar message when he brought a drug runner into a room lined with garbage bags and threatened her with a gun.  Through his violent acts and threats, the defendant intentionally created an atmosphere of immense fear.  The calculated terror that his actions engendered in his victims is not inherent to his crimes; it is a feature of the way the defendant chose to approach being a drug dealer.

But for sheer moral luck, the defendant would be before the Court having murdered two arson victims—in addition to having sex trafficked several women and run a huge criminal organization responsible for ruining hundreds of lives.  The fact that the arson victims did not die may provide a basis for a lower sentence, but any sentence short of 35 years' imprisonment would not reflect the seriousness of the defendant's offenses or provide just punishment for the offense.  See 18 U.S.C. § 3553(a)(2)(A).

The defendant's conduct is orders of magnitude worse than the average successful drug dealer, and he is not similarly situated to any defendant sentenced thus far in this case.  His closest analogue is Ayers, although Ayers is more culpable—in part, though not exclusively, because Ayers killed Jonathan Jackson.  Ayers faces a mandatory minimum sentence of 55 years' imprisonment and up to life imprisonment.  Neither sentence would shock the conscience if applied to Clarke.  But, in light of all of the factors of this case, the government respectfully submits that a 35-year term of incarceration is sufficient, but not greater than necessary, to achieve the goals of sentencing.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of at least 35 years' imprisonment, which, together with the PSR's requested

special and standard conditions of supervised release, would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/_____
Nicholas J. Moscow
Lindsey R. Oken
Joy Lurinsky
Victor Zapana
Michael Castiglione
Assistant U.S. Attorneys
(718) 254-7000

CC:    Counsel of Record
       U.S. Probation Officer Jennifer Baumann
       Clerk of the Court